# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
June 09, 2015 Session


## STATE OF TENNESSEE v. TANYA NICOLE SLIMICK


**Appeal from the Circuit Court for Williamson County**
**No. ICR055631     Michael Binkley, Judge**

_____


### No. M2014-00747-CCA-R3-CD – Filed December 17, 2015
_____


A jury convicted the defendant, Tanya Nicole Slimick, of first degree (premeditated) murder for shooting her boyfriend.  The defendant received a life sentence.  On appeal, the defendant challenges the sufficiency of the evidence, asserting that the State failed to show premeditation or to negate self-defense.  She also raises numerous challenges to the jury instructions, including that the trial court instructed the jury that the defendant had the burden of raising the issue of self-defense; that the self-defense instruction was confusing to the jury; that the jury instructions improperly failed to list the negation of self-defense in the litany of items which the State is required to prove beyond a reasonable doubt; and that the instructions failed to list lesser included offenses whenever the "charged offense" was referenced.   The defendant also asserts that there was reversible error in the use of a demonstrative aid in the prosecution's closing argument.  After a thorough review of the law and the facts, we affirm the judgment of the trial court.


**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and CAMILLE R. MCMULLEN, J., joined.

David L. Raybin, Nashville, Tennessee (at trial and on appeal), and Sandra L. Wells, Franklin, Tennessee (at trial), for the Appellant, Tanya Nicole Slimick.

Herbert H. Slatery III, Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; Kim Helper, District Attorney General; and Mary Katherine White and Jennifer Mason, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

At the time of the shooting on September 21, 2010, the defendant and the victim, Bryan Bell, had been in a romantic relationship for approximately seven years. The two began dating when they both worked at a T.G.I. Fridays near Pittsburgh, Pennsylvania, where the victim was also attending culinary school. The relationship had not been without turmoil, however. Edward Lenkiewicz, the victim's friend who worked with both the victim and the defendant in Pittsburgh, testified that the relationship was frequently rocky and tense, with the two "whisper fighting" in front of acquaintances.

Around 2006 or 2007, Selena Sancreek, a close childhood friend of the victim's, convinced the victim to move to the Nashville area. Ms. Sancreek had been renting a room in the Brentwood home of Billy Pirtle, and she arranged for the victim to take her room as she was vacating it. The victim moved to Brentwood and began to work as a cook at a nearby T.G.I. Fridays, while the defendant remained near Pittsburgh. At the time of the shooting, the defendant was living with her parents.

In Brentwood, the victim prospered socially and professionally. Shortly before his death, he was promoted to kitchen manager. He socialized with his roommates, Billy Pirtle and Justin Sowders, and with acquaintances from work. Around the end of July or early August 2010, the victim began a romantic relationship with Jennifer Earl, a server at the restaurant where he worked. The victim hid this relationship from Ms. Sancreek and others because managers were not permitted to date servers. At trial, Ms. Sancreek acknowledged having told detectives that she believed the victim would be loyal to one girlfriend.

The victim's father, Ms. Sancreek, Mr. Lenkiewicz, Ms. Earl, and the victim's roommates testified that he was friendly, easy-going, generous, and likeable. They testified that they had never seen him behave in a violent or aggressive manner. Mr. Lenkiewicz and Steven Slattery, who was the victim's supervisor prior to the victim's promotion, both testified that the victim did not act angry or aggressive even under stress at work. Witnesses testified that he always had a smile on his face. The victim's friends and family all testified that he always wore glasses except when sleeping, showering, or swimming and that he could not see without his glasses.

Although the victim and the defendant had been romantically involved for seven years at the time of the shooting, the victim apparently hid the duration and seriousness of his relationship with the defendant from his family, who lived in Ohio, and from his close

2

friends. The victim's father recalled seeing the defendant once, prior to the victim's move, when they both attended a musical performance the victim was giving in a tavern in Ohio; the victim's father was not introduced to the defendant. Ms. Sancreek likewise only met the defendant once, in a group setting.

From the time of his move to the Nashville area, the victim's family and friends all believed that the victim was no longer dating the defendant. Mr. Lenkiewicz testified that the victim visited the Pittsburgh area once after his move but went to great lengths to keep his visit a secret from the defendant, going so far as to sit for forty-five minutes in his car in order to avoid a mutual acquaintance he feared might reveal his visit. Another time, the victim asked Mr. Lenkiewicz not to tell the defendant that he was visiting the victim in Brentwood to attend a music festival, but the defendant found out and came uninvited. Ms. Sancreek and the victim's father both testified that they believed the victim and defendant had broken up prior to the move. The victim's new roommates and local acquaintances also all believed that the defendant was nothing more than a distant ex-girlfriend. None of the victim's friends or family were aware that he and the defendant had taken numerous trips together, that he had taken a road trip in August 2010 to visit the defendant in Pittsburgh, that he was sexually involved with the defendant, or that he was constantly in contact with her by telephone and text messaging. At trial, defense counsel gave the victim's father a ring which had been in the defendant's possession. The victim's father testified that the ring was cherished and valued by the victim and that the family had not known what had happened to it. Shortly after the shooting, Ms. Sancreek, unaware of the nature of the victim and defendant's relationship, told detectives that she would have known if the victim had been in a long-term relationship with the defendant.

Despite the victim's representations to his family and friends, the evidence at trial showed that the victim and the defendant were in a serious and intimate relationship, both before and after the victim's move to Nashville. Rachel Seifert, the defendant's supervisor at the T.G.I. Fridays in Pittsburgh, testified that the defendant quit her job in August 2009. Prior to that, the defendant had several times given notice that she was quitting to move to Tennessee. These planned moves always fell through. Telephone records, extending back into May 2010, show that the two were in daily contact, sending numerous text messages back and forth throughout this time and making numerous daily telephone calls. Although the defendant contacted the victim more often than the victim contacted the defendant, the calls and messages came from both parties. For example, on the first day that records were available, May 1, 2010, the defendant called the victim eleven times and sent him twenty-six text messages; the victim called her five times and sent her twenty-four text messages. Detective Jim Colvin testified for the State that the victim and defendant constantly communicated, and he gave August 20, 2010, as one example of the communications between the two; on that day, the defendant sent the

3

victim thirty-eight text messages and called him thirteen times; the victim sent the defendant eighteen text messages and called her three times.

In April 2010, the victim made reservations for the defendant at an extended stay motel near his home. Medical records show that the defendant was treated in Williamson County on April 26, 2010, for a urinary tract infection. The victim again made reservations for the defendant to stay at the motel beginning on May 1, 2010; she sought medical treatment in Williamson County on this day and was diagnosed with thrush. Telephone records indicate that the cellular telephones of the defendant and victim were in close proximity to each other and to the motel on numerous days between May 2 and May 17, 2010.

On May 16, 2010, the victim's telephone sent a series of threatening text messages to the defendant's telephone. The prosecution attempted to imply that the defendant obtained the victim's telephone and sent the messages to herself. Prior to these text messages, on August 18, 2009, the defendant had purchased a Smith & Wesson handgun at a store in Pennsylvania. The defendant also purchased pink handgrips for the gun as an accessory, and the victim's text messages reference the defendant's "pink thing." The defendant purchased a stun gun from the same store on December 21, 2009. The defendant apparently saved the threatening text messages onto her telephone, and on July 15, 2010, she forwarded some of them to her email. Cellular records show that the victim placed a call at 10:35 a.m. on May 16, 2010, and that the victim's telephone used a cellular tower near the motel where the defendant was staying. The series of threatening text messages begins at 11:27 a.m. The following text messages were sent from the victim's telephone to the defendant's telephone between 11:27 a.m. and 11:53 a.m. on May 16, 2010:

> "You will get it tomo[r]row at your house"

> "yes I proMise im moving"

> "Stop. cause if you dont s*ck me in your parents room, then i will kill you with your pink thing. now stop you know we are not to discus this on the phone. keep acting like this and I will kill your parents too infront of you"

> "Cause im f**ked up. i do lpve you. just please listen to me and everything will be fine. i am sory baby"

4

"Yes if i had too. stop talking about this now or taz[1] is next. and erase all these texts now"

"Ok. just know that i still have frends in pitt who can help me do things. so you never know what can happen. now stop. iM done talking"

Records show that the defendant's telephone was also sending text messages to the victim's telephone in between these messages, but the bulk of the defendant's responses were not preserved. Her telephone preserved one sent message asking "then why cant i have my pink now?" This message was in response to the victim's text message promising to move. At 3:58 p.m., the victim placed a telephone call which used a cellular tower near the motel.

In early June of 2010, the victim again made reservations for the defendant to stay at the motel near his home. Ms. Sancreek testified that the victim told her that the defendant was in town in June and again sometime around August. The victim seemed frustrated because the defendant "seemed to pop up" when he had other plans or work.

The victim's roommates knew the defendant by sight because there were two or three occasions when the defendant arrived in town while the victim was not at home and sat in her car in the parking lot, awaiting the victim's return. Ms. Sancreek also saw the defendant sitting in the victim's parking lot one time. In late June or early July, Mr. Sowders saw the defendant sitting in her car, and Mr. Pirtle decided to invite her into the home. Mr. Pirtle's impression was that the defendant was extremely shy and very fragile. The defendant told the roommates that she had packed all of her possessions because she and the victim were leaving to get married and to move to California the following day. Mr. Pirtle knew that the victim did not intend to move. The victim's extremely cluttered room was not at all packed, the victim had just been promoted, and he seemed happy with his life in Brentwood. Mr. Pirtle tried to delicately let the defendant know that the victim did not appear to intend to move. Mr. Sowders testified that the defendant also told the roommates that the victim had been on his way to visit her on New Year's Eve when his car was in an accident in Kentucky, and he was put into jail. Mr. Sowders knew that the victim's vehicle had never been in an accident. Mr. Sowders acknowledged that he had told police that he thought the victim was making up the accident as an excuse not to visit the defendant. When the roommates told the victim about the defendant's implausible stories, the victim said he would "handle this" and that "some of it might be [his] fault."

---

[1] Taz was the name of the defendant's small dog.

Telephone records reveal that between July 7 and July 11, 2010, there were no text messages or calls exchanged between the two. After the shooting, Detective Jim Colvin found two crumpled pages of a letter apparently written by the defendant to the victim in a trash can in the victim's room. The pages were underneath food trash with a July 5, 2010 receipt. Helping to organize the victim's possessions after his death, Mr. Pirtle found one more page of the handwritten letter. Ms. Sancreek believed that the letter was written in June or July. The letter from the defendant to the victim begins,

> I don't even know what to say anymore. You're a horrible person. And the best liar I know. I gave up my life for you. You kept promising me everything. How could you be so cruel to me? How could you be so cruel to anyone? It's not human how you treated me. And you swore on your family and your mother's cancer! I mean who does that? If you didn't want me 4 years ago, then why string me along and do this to me?

The defendant details her feelings of hurt and betrayal, her extreme investment in the seven-year relationship, and her belief that the victim has deceived her and lied to her. She calls the victim a monster. The letter does not refer to the victim behaving violently toward the defendant. However, she ends the letter by telling him, "Think about my love for you. If you do want to rekindle us then don't be afraid to ask me." Detective Colvin testified that he found what appeared to be a draft of this letter in the defendant's papers which she had brought to the victim's home just prior to the murder. The draft ends by telling the victim that the defendant will never take him back. The draft also contains the following sentences, marked through to signify deletion: "I could hurt you if I really wanted cause I have a lie that I kept a secret for a long time. Actually, I have 3 lies I've told you. No 4 lies."

Despite the rupture, the defendant and victim resumed their relationship. On July 12, 2010, the defendant sent seven text messages to the victim and called him six times. The victim called the defendant once. On July 20, 2010, the victim ordered black high-heeled shoes with heels fashioned to resemble gun barrels to be delivered to the defendant. On August 8, 2010, he checked on the order status because it had not been delivered.

On August 12, 2010, the victim took a road trip to visit the defendant in Pennsylvania. Pictures recovered from the victim's telephone document his drive to see the defendant. The victim apparently sent these pictures to the defendant as he traversed the interstate; he also sent intimate pictures of his unclothed body. Cellular telephone

6

records establish that the telephones of the victim and defendant were in close proximity to a hotel in Pennsylvania on August 12, 2010.

Although the defendant had previously discovered from the victim's roommates that the victim did not intend to move, the victim emailed her a picture of a moving truck on August 24, 2010. A search of the victim's computer revealed that the victim performed several internet searches for moving trucks and that the image was simply a photograph he had found on the internet.

On September 10, 2010, the victim sent the defendant a picture of his clothed crotch and several images taken on the interstate. The defendant's expert in computer forensics determined, however, that at least one of these photographs was taken from a southbound location on Interstate 65 near the victim's home and was not from a long-distance road trip to see the defendant. At approximately 6:09 p.m. on September 10, 2010, the defendant began to call the victim. The defendant placed approximately three hundred and fifty calls in a row to the victim's number, continuing to call over the next two days; the victim finally called the defendant on September 12th. The victim's telephone contained intimate pictures that he sent to Ms. Earl around the time he was receiving the numerous calls from the defendant.

At some point, the defendant discovered that the victim was also in frequent contact with his new girlfriend, Ms. Earl. The defendant's reaction was to track the calls and to attempt to contact Ms. Earl. Among the defendant's journals found in her luggage, Detective Colvin found a paper tracking various numbers called by the victim. Calls between Ms. Earl's number and the victim's number were counted with tally marks beginning on September 14, 2010. On that same day, Ms. Earl was out of town on vacation when she received a call from the defendant. The defendant had dialed "*67" to restrict the origin of the call. Ms. Earl did not answer the call. The defendant's papers also contained two drafts of a text message to Ms. Earl, who the defendant apparently believed was called "Bridgette." The draft begins "hi, B, this is T," and admonishes the recipient that the "obsessive texting" is affecting the relationship between the victim and defendant.

Despite her discovery that the victim might be involved with another woman, the defendant came to visit the victim on the weekend of September 19, 2010, with the apparent understanding that they would move in together shortly.

On Sunday, September 19th, the victim and Ms. Earl attended a football game downtown around noon. While the victim was out on this date with his new girlfriend, the defendant arrived in Brentwood. Ms. Earl testified that the victim's telephone kept "going off" during the game but that he assured Ms. Earl that everything was fine.

7

Shortly after 5:00 p.m.,[2] the defendant, who had placed six unanswered calls to the victim, called Ms. Earl four times, dialing "*67" to block her telephone number. She also placed one restricted call to the victim's work. These calls originated using a cellular telephone tower near the victim's residence. Ms. Earl did not answer the first two calls, but the victim urged her to answer the third. The defendant asked Ms. Earl if she was "Bridgette" and asked to speak to the victim. Ms. Earl was startled because she and the victim had kept their relationship a secret due to restrictions at work. The defendant called again, and the victim talked to the defendant in Ms. Earl's yard. Ms. Earl and the victim went out to eat. The victim told her that the defendant was his ex-girlfriend and that their relationship had been "hideous."

On the Sunday of the defendant's arrival, Mr. Pirtle was out of town on vacation, and Mr. Sowders was preparing to leave on an early morning flight the next day. At around 6:30 p.m., on Sunday, Mr. Sowders returned home from work and saw the defendant's Jeep in the parking lot. She was in the vehicle with the seat reclined. Mr. Sowders decided not to invite her in, but he went into the house and sent a text message to the victim. He received no response. Prior to going to sleep around 11:00 or 12:00 that evening, Mr. Sowders looked out the window and saw that the defendant was still sitting in her car. The doors of the residence were, according to the roommates' custom, unlocked. When Mr. Sowders woke the next morning, he went to shower in the bathroom next to the victim's bedroom. The victim's bedroom door was cracked as usual to allow his cat access to the litter box. When Mr. Sowders left the bathroom, the victim's bedroom door was completely closed and the defendant's car was empty in the parking lot. The victim was not home. Ms. Earl testified that the victim stayed at her house that night and left around 7:30 a.m. to go to work.

Ms. Sancreek and Mr. Slattery worked with the victim at the restaurant the following day, September 20, 2010. Ms. Sancreek took out some trash around 3:30 or 4:00 p.m., and she overheard the victim speaking on the telephone on the back loading dock. The victim was saying "that they were friends," and he said, "move on with your life[;] I'm here for you, but I'm seeing somebody." Mr. Slattery saw the victim on the back loading dock with his telephone out around 7:00 or 8:00 p.m. that night. The victim told Mr. Slattery that "that crazy b***h is back in town."

The victim and defendant exchanged a number of text messages that day. At the same time, the victim was also sending text messages to Ms. Earl regarding his happiness in their relationship. Detective Colvin acknowledged that a preservation letter was not

---

[2] Testimony at trial indicated that the times of telephone calls were incorrect in certain exhibits because the times reflected Eastern rather than Central time.

sent to Verizon immediately after the defendant's arrest; thus, only the text messages that had been saved on the defendant's and victim's telephones were recovered. Some of the victim's responses to the defendant apparently had to do with his relationship with Ms. Earl. For instance he sent her a text message that read, "My girlfriend." He then responded to a question with, "no. but i told her i thought it was excesive that i was being tracked and my calls being monitored and traced."

At around 8:00 p.m. that evening, the victim and defendant exchanged the following series of text messages:

> Defendant: baby im cold. i need ur body. r u on ur way?
> Victim: on my last project.
> ….
> Defendant: can u still f\*\*k me? plz. ill wear the shoes
> Victim: Ok
> Defendant: did u really try to get an aptmnt friday?
> Victim: Yes.  all day
> Defendant: r u still gonna get us a place? u help ur friends and im ur friend?
> Defendant: so ur still getting a truck on tues?
> Victim: thats the plan
> Defendant: i know its the plan. r u really gonna do it?
> Victim: probably
> Defendant: then why did u cancel the hotel?
> Victim: cause i found out my roommates were both going to be oit of town

The defendant then drafted, but did not send, several text messages regarding Ms. Earl to the victim, including, "is she gonna help u kill me," "why did u tell me not to come yesterday," and one message asking the victim whether he would impose on her by continuing their sexual relationship while hiding some infidelity. Instead, the defendant sent the victim a text message asking about food. She then sent him, three times, a text message asking, "why did u say we need to talk? and why didnt u say u love me? but u plan on moving?" She sent a final text urging him to respond to this question. Ms. Sancreek testified that the victim left work after 9:00 p.m., taking a to-go order of food that appeared to be for more than one person.

At 3:39 a.m., the defendant placed a call to her parents which lasted for two minutes and fifty-four seconds. At 3:42 a.m., the defendant called 911. After the defendant informed the operator of her location, the following exchange took place:

9

Defendant: My boyfriend tried to kill me.
Operator: What did he do?
Defendant: He … he stole my gun from my house like a long time ago and he, he….
Operator: He what? Ma'am, just calm down and talk to me, OK? Is he still there?
Defendant: Yeah, I think he's dead….We were struggling with the gun, and he told me he was going to kill my parents, so I shot him.

The defendant was crying throughout the call, and she told the operator that she was going to pass out. The call was disconnected, and the operator called back. When asked if the victim was breathing, the defendant sobbed that she did not want to touch him. The defendant was unable to tell the operator where the gun was or how many times she fired the weapon. The defendant also told the operator, "I shouldn't have come down here." Officers arrived on the scene, and the defendant was taken into custody.

The parties stipulated that the pink-handled gun had fired all four bullets which were shot. Witnesses agreed that there was one bullet remaining in the weapon and that no one had attempted to fire this bullet. Beyond that, the State attempted to show that the physical evidence supported premeditation, whereas the defendant attempted to establish that the physical evidence showed that she was acting in self-defense.

Officer Christopher Woodard arrived on the scene and saw the defendant, wearing a black tank top and pants, lying on her back on the living room floor next to a telephone. The defendant was barefoot, and Officer Woodard saw dried blood on the bottoms of her feet. She appeared dazed and offered no resistance. The victim was lying face-down in the hallway outside his bedroom, with the upper part of his body in the bathroom, clothed only in a black T-shirt. He appeared deceased, and there were large amounts of blood in the hallway and bedroom. Initially, the defendant could not tell officers where the gun was located, but she finally answered that she had thrown it into the bedroom. In the bedroom, Officer Woodard pulled the comforter back from the bed to make sure no one was underneath. He found a knife lying under the comforter. Officer Woodard acknowledged that his report said that he saw signs of a struggle in the bedroom and that he did not mention moving the comforter in his report.

Sean Bardo, a paramedic, found the victim deceased with a large gunshot wound in the center of his back. Mr. Bardo testified that there was a lot of blood and that some of the blood was wet and some was dry. The victim was cool to the touch. Mr. Bardo could not answer whether these observations indicated a passage of time since the injury.

10

In examining the gunshot wound to the victim's back, Mr. Bardo lifted the victim's shirt briefly.  Mr. Bardo did not examine the defendant, although he testified that fainting would be considered a medical emergency.

Dr. Bridget Eutenier, the medical examiner, testified that the victim died of multiple gunshot wounds.  The autopsy revealed that he had been shot four times and that two of the bullets had exited his body.  The victim was shot once at the base of the neck, with the bullet traveling front to back, left to right, and in a downward trajectory.  This bullet was recovered from the victim's body.  He was also shot in the right hip, with the bullet entering from the front of his body and exiting in the back and traveling essentially level but slightly downward.  There was a superficial bullet wound to his back on the upper left shoulder, with the bullet traveling left to right and slightly upward and exiting near the entrance wound.  The victim suffered a fourth gunshot wound in his back.  The bullet traveled back to front and left to right and was recovered during the autopsy.  The medical examiner testified that the neck wound would be most likely to bleed in an arterial pattern, with blood flow increasing each time the heart pumped.  The medical examiner testified that the downward angle of the neck wound could have been created if the victim were bending over or if the shooter were elevated.

Special Agent Alex Brodhag, a firearms examiner, testified that he examined the victim's shirt and found six holes.  He could not determine the range from which the bullet that entered at the base of the victim's neck or the bullet that pierced the victim's back shoulder was fired.  However, Agent Brodhag was able to determine that the bullet causing the hip wound was fired less than four feet from the victim, and the bullet from the wound to the back was fired between three and thirty-six inches from the victim and most resembled the pattern of a shot fired twelve inches away.

In addition to the fatal gunshot wounds, the victim suffered blunt force injuries to his head.  There were lacerations and tears on his left ear, and there were lacerations and contusions predominantly on the back left side of his head.  There were also two small abrasions on his face.  The medical examiner agreed that these abrasions could be consistent with the prongs of a stun gun. The medical examiner found at least seven impact sites on the victim's head.

Witnesses testified that the victim kept a very cluttered and messy room.  Captain Richard Hickey agreed that it was difficult to determine if there was a struggle or if the room was just messy.  An alarm clock which the victim's roommates and Ms. Earl had seen in working order was unplugged and turned to the wall, and a bottle of water on the nightstand was on its side.  Nothing in the room appeared to be broken.  The handgun was located under a woman's red and black shirt in the victim's bedroom.  It was covered

11

in blood except on the handles. Between the mattress and box spring were some pieces of women's lingerie.

The victim's glasses were found on the nightstand in the bedroom.

The defendant's cellular telephone, which did not appear to have blood on it, was found in the dining room next to the defendant. The victim's cellular telephone was covered in blood and appeared to have been moved, because it was found on a desk surrounded by items that did not have blood on them.

Johnny Lawrence, an expert in crime scene analysis and blood spatter, examined the photographs and videos of the crime scene. He testified that he believed the first shot caused the victim's neck wound and that it was fired while the victim was between the bed and the dresser near the head of the bed. He acknowledged that the bullet trajectory in the victim's neck was consistent with him bending over and reaching for the defendant. He testified the blood evidence and bullet trajectory were also consistent with the victim being on his knees. He testified that he believed the second shot was the one that injured the victim's hip and that it was fired from the area near or on the bed. He determined that this shot was fired while the bedroom door was partially closed because the bullet was recovered from the closet door, which would have been obscured if the bedroom door had been open. The bullet entered the closet door approximately two feet above the ground. Mr. Lawrence found no blood on the inner door knob, leading him to believe that the door was then opened without use of the handle. While the bedroom door was open, a third shot was fired. Mr. Lawrence testified that this shot would have caused the victim's shoulder wound. The third bullet pierced the bedroom door and was recovered from the wall behind it. The bullet was traveling upward and entered the door sixty-nine inches from the ground. Both bullets recovered from the bedroom tested positive for the victim's DNA.

There were blood stains on the door from the victim leaving the room, and there were arterial spurts on the hallway wall. Mr. Lawrence believed that the victim was probably not standing at this point. Mr. Lawrence testified that the final shot struck the victim's back. This shot was fired while the victim lay face-down in a position close to that in which his body came to rest. Mr. Lawrence was able to make this determination because the blood flow from the wound was toward the side and not toward the feet. He also testified that the hole in the victim's shirt was aligned with the wound. Mr. Lawrence was not aware that Mr. Bardo had testified that he lifted the victim's shirt as he attempted to administer first aid.

Mr. Lawrence was not able to determine if the blunt force injuries to the head were administered in the bedroom or hallway. He did not see any cast-off stains as he would

have expected. He testified that the few blood drips in the dining room would not have come from the victim because there was not enough blood. According to Mr. Lawrence, the victim's bloody telephone had been moved because its surroundings were not bloody, but the telephone had blood stains from a finger swiping across the glass. Mr. Lawrence also testified that the defendant did not have a large amount of blood on her person and that he would have expected to see the same type of stains on her as on the bed and floor.

Mr. Lawrence testified that a small room might have been filled with smoke and that a "concussion effect" could have obscured the sound of multiple gunshots. Accordingly, he acknowledged that it was possible that the defendant would not know how many times she had fired, how many times the victim was hit, or whether the victim still presented a threat. He acknowledged that a person who had been assaulted and then was grabbed by the assaulter might become scared and fire a final shot.

Mr. Lawrence testified that the knife in the bed was placed there after the victim had left the bed. Detective Colvin also testified that the knife in the bed was laid on top of and partially obscuring some drops of blood. Detective Colvin testified that some of the blood drops under the knife did not transfer onto the knife, indicating that they could have been dry prior to the knife being placed in the bed.

Near the victim's body, police found the battery cover for a "saber" two-prong stun gun. The stun gun itself was set on top of one of the defendant's pieces of luggage, with the battery cover missing. DNA testing revealed that DNA on the probes matched the victim's DNA. The victim's blood was also recovered from the handle of the stun gun. Lying on the floor in the bedroom was a second stun gun. The boxes which were apparently the packaging for these stun guns were found in the defendant's luggage, and they did not appear to have any tears or blood on them. The "saber" stun gun had Duracell batteries, and the defendant's luggage contained packages of Duracell and Energizer batteries. The defendant's luggage also contained pepper spray and three latex gloves, as well as numerous journals and personal papers. One of these papers contained one-line descriptions of sex acts, which Detective Colvin testified were consistent with "phone sex." Also on top of the luggage were the shoes that the victim had ordered for the defendant in July. Captain Hickey acknowledged that he did not collect these shoes.

The knife found on the bed appeared to have been taken from a set of kitchen knives kept on a magnetic strip by the stove. The knife itself had little blood on it, although it was lying on a sheet with numerous blood stains. The victim's blood was found on the knife blade. The handle of the knife had a weak positive result for blood. Testing showed that DNA from the handle came from two or more individuals, including the victim and another unidentified male. Mr. Sowders testified that this knife belonged to him and that he used the knife daily.

13

In the dining room, police recovered what appeared to be the victim's canvas sneakers. The sneakers were neatly lined up near where the defendant was found, and the victim's blood was found inside the shoes. Mr. Lawrence testified that the blood inside the victim's sneakers had been transferred there by something coming into contact with the shoes.

Detective Amy Cole photographed the defendant to document evidence and injuries. On September 21, 2010, she documented blood on the defendant's feet and legs, and she photographed blood marks which were consistent with bloody fingertips swiping the defendant's legs. These marks were underneath the legs of the defendant's pants. Mr. Lawrence testified that these marks were consistent with the victim reaching for and grabbing the defendant. There were red marks on the defendant's chest and bruises on her arms that appeared older. Detective Colvin also saw a scratch on her neck. The defendant's nails were not broken. Her hands were clean, but there was dried blood under her nails. The defendant's fingernails from her left hand were collected, and they tested positive for the victim's DNA. Officers testified that the defendant had not been permitted to wash her hands after they arrived on the scene, but her hands were not bloody except under the nails. The victim's blood was also on the defendant's tank top, pants and underwear. Testing on the victim's fingernails yielded the victim's DNA, along with a minor contributor who could not be identified.

On September 24, 2010, the defendant was again photographed. There were five large bruises on her thighs and on her shins that had developed since photographs taken the day of the crime. Mr. Lawrence testified that he had seen assault victims sustain bruising similar to the defendant's.

The defendant's doctor, Andrew DeMarco, testified that he had been treating the defendant since 1999 and that she suffered from anxiety. In 2009, the defendant complained that she had gained twenty to thirty pounds in one year, and Dr. DeMarco concluded that the cause was anxiety. The defendant's anxiety also induced fainting spells. In September 2010, the defendant had fainted and hit her head, and her parents took her to the emergency room and then to Dr. DeMarco. Dr. DeMarco testified that the feeling of an incipient fainting spell is "an unmistakable sensation" and that he had advised the defendant to lie down flat on her back, in the position she was found in by police, if she felt she was going to faint. He also testified that fainting would often result in a loss of memory which would extend backwards from the time the patient fainted and also would extend forward from the time the patient revived. Events occurring in that time could be confused or would not be remembered. Dr. DeMarco testified that the defendant did not tell him she was in an abusive relationship; however, he testified that her parents generally, although not always, were present for her appointments.

14

After the defendant was incarcerated, she made a telephone call to her mother. Despite her mother's warning not to say anything on the telephone, the defendant told her mother to get items from a canvas bin in her bedroom and "give it to Daddy – you know what Daddy does – give it to Daddy to do that this morning." She elaborated that she wanted her mother to give her father the items to "take down outside." Detective Colvin went to the defendant's parents' home. The defendant's possessions appeared unpacked. Detective Colvin found a burn barrel in the back of her home but was unable to determine whether evidence had been destroyed. There were several partially burned items in the barrel, including coupons. He also found a box of ammunition fitting the weapon, and there were five rounds missing. Detective Colvin acknowledged that it was possible that the defendant wanted the paper containing the list of sex acts destroyed and had forgotten that she packed it. Detective Colvin testified that during the call to her mother, the defendant demonstrated a concern about what people would think of her and also a concern for the animals living at the victim's house. The defendant also spoke to her mother about canceling an appointment for a haircut.

The victim's roommates hired a company to clean the contaminated parts of the house after the homicide. The company took all of the victim's possessions that were salvageable and put them into bags. In sorting the victim's possessions, Mr. Pirtle found a holster which fit the firearm used to shoot the victim, and he found some paperwork regarding the weapon. He gave the holster and papers, along with the missing page of the defendant's July letter, to Mr. Sowders, who gave them to Detective Colvin. Captain Hickey acknowledged that he had not found the holster when he searched the room. The holster did not have any blood on it.

During trial, the defendant filed a request for special jury instructions with the trial court. The defendant modified the instruction on the presumption of innocence and the burden of proof to include a statement that the State must negate the theory of self-defense beyond a reasonable doubt. The defendant also included in this section and in the identity charge a request that lesser-included offenses be mentioned whenever the instruction referred to the crime charged. The defendant's request also put the instructions on self-defense into a separate sentence from the "no duty to retreat" instruction, and it removed the phrase, "If evidence is introduced supporting self-defense" from the instruction.

The State's closing argument was filled with references to self-defense. The prosecutor told the jury that the State had to prove beyond a reasonable doubt that the defendant did not act in self-defense. In the State's final argument, the prosecutor closed with the assertion that the State had carried its burden to show that the defendant did not act in self-defense.

15

In closing, the defense described its theory of how the shooting occurred. The defense asserted that the victim had been the aggressor and that the defendant had shot multiple times in confusion, delivering the final shot in the belief that the victim was grabbing her legs to attack her.

The State then began its rebuttal. At some point during the proceedings, the prosecution had had a door, similar to that in the victim's bedroom, hung into a movable frame. The prosecution had not used this door in its initial closing, but in rebuttal, the two prosecutors brought out the door and reenacted their theory of the series of events that led to the victim's death. The defense objected to the use of this evidence, noting that defense counsel had no opportunity to respond. The trial court twice gave limiting instructions, admonishing the jury that closing argument was not evidence, but it allowed the prosecution to use the door.

The jury convicted the defendant of first degree (premeditated) murder, and she received a life sentence. The defendant filed a motion for a new trial, which the trial court denied. On appeal, the defendant asserts that the State did not prove premeditation beyond a reasonable doubt and that the State did not disprove beyond a reasonable doubt that the defendant was acting in self-defense. She also challenges the jury instructions on numerous grounds, including: that the trial court improperly submitted a question of law to the jury; that the self-defense instruction was confusing and should have been broken down into multiple sentences; that the jury instructions were improper in that the State's burden to disprove self-defense was not listed among the elements of the crime; that the jury instructions improperly failed to mention lesser-included offenses each time the "charged crime" was referenced; and that cumulative error in the instructions entitles her to relief. Finally, the defendant argues that the use of the doorway in rebuttal argument was reversible error.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant asserts that the State did not prove premeditation beyond a reasonable doubt and that the highest charge the evidence would support is voluntary manslaughter. According to the defendant, the proof shows that she was acting in a state of passion and not with premeditation. The defendant also insists that the proof does not show beyond a reasonable doubt that she was not acting in self-defense.

This court must set aside a finding of guilt if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt. Tenn. R. App. P. 13(e). In evaluating the sufficiency of the evidence, the court must determine whether, considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002). This court will not reweigh or reevaluate the evidence, and it may not substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004). A jury's verdict of guilt, approved by the trial court, resolves conflicts of evidence in the State's favor and accredits the testimony of the State's witnesses. *State v. Smith*, 436 S.W.3d 751, 764 (Tenn. 2014). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court must afford the prosecution the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *State v. Pope*, 427 S.W.3d 363, 368 (Tenn. 2013). A guilty verdict replaces the presumption of innocence with one of guilt, and on appeal, the defendant bears the burden of demonstrating that the evidence is insufficient to support the conviction. *State v. Cole*, 155 S.W.3d 885, 897 (Tenn. 2005). The elements of an offense may be established exclusively by circumstantial evidence, and the standard of review is the same for direct and circumstantial evidence. *State v. Echols*, 382 S.W.3d 266, 283 (Tenn. 2012). The State is not required to exclude every reasonable hypothesis save guilt. *State v. Hawkins*, 406 S.W.3d 121, 131 (Tenn. 2013).

The defendant was convicted of first degree premeditated murder, which is "[a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2010). A premeditated act is one "done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d). Premeditation requires a finding that "the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." T.C.A. § 39-13-202(d). The statute also specifies that "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." T.C.A. § 39-13-202(d).

Premeditation is a question of fact for the jury's determination. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). It may be established by any evidence which could lead a rational trier of fact to infer that premeditation was established by the proof as required by statute. *Id.* at 615. Courts frequently look to the circumstances surrounding a killing to discern the presence of evidence sufficient to support a finding of premeditation. *State v. Larkin*, 443 S.W.3d 751, 815 (Tenn. Crim. App. 2013).

Factors which tend to support the existence of premeditation include: the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing. *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). The factors listed in *Bland* are not exhaustive, however. *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013). The nature of the killing or evidence establishing a motive for the killing may also support a conclusion that the crime was premeditated. *Id.* Repeated blows, although not alone sufficient to establish premeditation, may be a relevant factor in determining the existence of premeditation. *Id.* Mutilation of the body may show that a killing was not rash or impulsive. *Davidson*, 121 S.W.3d at 615. Lack of provocation by the victim, failure to render aid, and destruction or secretion of evidence may also support an inference of premeditation. *Larkin*, 443 S.W.3d at 815-16 (citing *State v. Thacker*, 164 S.W.3d 208, 222 (Tenn. 2005); *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000)). "Under *Bland*, shooting a retreating victim alone provides circumstantial evidence of premeditation." *State v. Dickson*, 413 S.W.3d 735, 746 (Tenn. 2013).

When the evidence is insufficient to support a finding of premeditation, the appellate court may reduce the conviction to a lesser-included offense. *See State v. Jackson*, 173 S.W.3d 401, 408-10 (Tenn. 2005) (concluding that the evidence was insufficient to support premeditation when the only factors present were the use of a deadly weapon on an unarmed victim and concealment of evidence); *State v. Ricky A. Burks*, No. M2000-00345-CCA-R3-CD, 2001 WL 567915, at *17-18 (Tenn. Crim. App. May 25, 2001) (holding proof insufficient to establish premeditation despite the use of deadly weapon on an unarmed victim, repeated blows, and concealment of evidence, explaining that "[t]he absence of planning activity and the absence of the events immediately preceding the killing militate against proof of premeditation or that the [defendant] killed according to a preconceived design"); *State v. Long*, 45 S.W.3d 611, 622 (Tenn. Crim. App. 2000) ("[T]his Court has the authority to order a reduction in the degree of the offense for which Defendant could be convicted"); *see also Larkin*, 443 S.W.3d at 816-18 (concluding that proof failed to establish premeditation where factors supporting premeditation were not present); *State v. Patrick Wingate*, No. M1999-00624-CCA-R3-CD, 2000 WL 680388, at *6-7 (Tenn. Crim. App. May 25, 2000) (holding proof insufficient to support first degree premeditated murder conviction although State adduced proof of financial motive, the defendant's lack of emotion upon leaving the scene, and the infliction of multiple blows).

The defendant also asserts that the State failed to negate self-defense. That the accused was acting in self-defense is a complete defense to an offense. *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). The burden of negating self-defense, like the

burden of proving premeditation, lies with the State. T.C.A. § 39-11-201(a)(3). Whether a defendant was acting in self-defense is a question of fact for the jury. *State v. Echols*, 382 S.W.3d 266, 283 (Tenn. 2012); *State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994). The defendant is entitled to relief if she can show that the evidence of self-defense in the record "raises, as a matter of law, a reasonable doubt as to [her] conduct being criminal." *Clifton*, 880 S.W.2d at 743. Under Tennessee Code Annotated section 39-11-611(b)(2):

> Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
> (C) The belief of danger is founded upon reasonable grounds.

The jury must determine the reasonableness of the defendant's belief that deadly force was required to protect against the imminent danger of death or serious bodily injury. *See Clifton*, 880 S.W.2d at 744; *see also State v. Renner*, 912 S.W.2d 701, 704 (Tenn. 1995) (concluding that the jury's determination encompasses "whether the defendant's belief in imminent danger was reasonable, whether the force used was reasonable, and whether the defendant was without fault"). Circumstances surrounding the offense may show the genuineness of the defendant's fear. *Ivy*, 868 S.W.2d at 727. The defendant's conduct and mental state must meet an objective standard of reasonableness in order for the homicide to be justified. *State v. Bult*, 989 S.W.2d 730, 732 (Tenn. Crim. App. 1998). Self-defense "is not limited to the exact moment of the assault that may be considered in connection with the entirety of the events leading to the assault." *Ivy*, 868 S.W.2d at 727.

There was evidence at trial from which a jury could have inferred that the killing was not premeditated or that the defendant acted in self-defense. The defendant's text messages indicate that instead of planning to harm the victim, she expected to move in with him. The defendant also introduced evidence that the victim had taken possession of the murder weapon. The victim's May 16, 2010 text messages to the defendant reference his possession of the "pink thing" and contain threats to kill her, her parents, and her dog with the weapon. Furthermore, the holster and paperwork associated with

19

the gun were found among the victim's possessions, and these items were not bloody, indicating that they were not in the immediate vicinity of the shootings. The defendant drafted but did not send a text message to the victim on the night before the killing, asking him, "is she [Ms. Earl] gonna help u kill me[?]" The message supports the inference that the defendant was worried about her personal safety. The gun was purchased not in close proximity to the shooting but over a year before the crime. When the defendant called 911, she told the operator that her boyfriend had tried to kill her and that they struggled over the gun. The first two shots that injured the victim were fired while the victim faced the defendant, and experts testified that the first serious wound was consistent with the victim bending over to reach for the defendant. The defendant was manifestly distressed during the 911 call. Her demeanor after the crime demonstrated lack of calmness. She had previously suffered from loss of consciousness related to anxiety, and after telling the operator several times that she thought she might faint, she lay down in the position recommended by Dr. DeMarco to prevent fainting; she was found by law enforcement in this position. Detectives found a knife in the bed. Officer Woodard's report described the room as consistent with a struggle; an alarm clock which was normally working was unplugged and facing the wall, and a water bottle lay on its side on the nightstand. Moreover, the defendant developed significant bruising on her thighs and legs, which Mr. Lawrence testified were consistent with bruises that he had seen assault victims sustain.

However, the State also introduced evidence supporting a finding of premeditation and negating the theory of self-defense. In presenting the extensive evidence of the long-term relationship between the victim and defendant, the State established that the defendant may have had a motivation to kill the victim. The victim had been deceiving the defendant for years regarding the nature of their relationship, apparently promising her that he was making a long-term commitment to her and that they would live together but then repeatedly backing out. The defendant came to visit the victim with the alleged expectation that they were going to move in together and continue their romantic relationship. However, photographs of the defendant's home show that her possessions were not packed. Prior to her arrival, the defendant discovered that the victim was sending numerous text messages to another woman. After the defendant came to Brentwood, she was apparently confronted with the fact that the woman was the victim's new girlfriend and that he did not intend to continue his relationship with the defendant.

Although the defense presented evidence that the defendant had not procured the murder weapon for the purpose of killing the victim, the State presented evidence that she procured other weapons for the visit with the victim. In packing for the trip, the defendant brought a container of pepper spray and two separate stun guns. At the crime scene, both stun guns had been removed from their packaging, and the packaging had been replaced inside the defendant's bag. The packaging did not appear to have been

20

opened in haste and did not have blood on it. One of the stun guns was found on the floor, and the "saber" stun gun, covered with the victim's blood and DNA, was placed on top of the defendant's luggage. The battery cover of the "saber" stun gun was found lying in the hallway, close to the victim's body. The defendant's text messages show that the defendant, if she did not possess the pink-handled gun, was aware that it was at the victim's residence.

The victim appears to have been unarmed at the time that the shots were fired. He was also not wearing the glasses that he always wore, and he was not fully clothed when his body was discovered. Furthermore, witnesses testified that the evidence regarding the first shot was consistent not only with the victim leaning over to reach for the defendant, but also with the defendant standing over the victim on his knees. The administration of repeated blows is also a factor supporting premeditation. Although the first two shots were fired with the victim facing the defendant, two other shots were fired into the victim's back. The evidence was consistent with the shooter following the victim into the hallway. The final shot was fired from three to thirty-six inches away when the victim was face-down and close to the position in which his body was found. The victim also suffered at least seven blows to the back of his head, and his DNA was found on the prongs of the "saber" stun gun.

Evidence also supported the inference that the defendant did not call 911 immediately and that she altered the crime scene. The defendant called her parents prior to calling 911. Law enforcement and Mr. Bardo testified that some of the blood at the scene was beginning to dry when they arrived. Officers testified that the defendant was not permitted to wash her hands at the crime scene but that blood was only found beneath her fingernails. The victim's shoes, which had blood inside them that had been transferred there by some other object, were found next to the defendant, who had blood on the soles of her feet. The defendant's legs, underneath her pants, looked like bloody fingers had swiped them. Accordingly, the jury may have inferred that the defendant washed her hands at the scene, put on the victim's shoes to walk around the house, and donned pants. Further, the evidence supports the inference that the defendant moved the knife. Both Detective Colvin and Mr. Lawrence testified that the lack of blood on the knife indicated that it had been moved after the shooting. Finally, while the alarm clock and water bottle appeared disturbed, other items in the room were not knocked over.

In reviewing the sufficiency of the evidence, we cannot reweigh or reevalute the evidence but must restrict our review to determining whether a rational trier of fact could have found that the State had proven the necessary elements beyond a reasonable doubt. Whether the State established premeditation or negated self-defense are questions for the jury. The evidence supported the conclusion that the defendant had motivation to commit the crime, that she packed two stun guns on her trip to visit the victim, whom she knew to

have her gun, that the defendant removed the stun guns from their packaging after arriving at the victim's home, that she administered repeated blows, that the victim was unarmed and without his glasses at the time the shots were fired, that the defendant altered the crime scene, and that she delayed reporting the shooting. The victim's face had abrasions consistent with a stun gun, his DNA was found on the stun gun, and he suffered repeated blows to the back of his head. We conclude that this is legally sufficient to support the finding that the crime was premeditated.

Likewise, the evidence was legally sufficient to support the conclusion that the State negated the theory of self-defense beyond a reasonable doubt. Although the defendant testified that she and the victim struggled with the gun, the jury was at liberty to disbelieve her. The evidence showed that the victim was clothed only in a T-shirt and that he was not wearing his glasses. The victim's room was extremely messy, but nothing appeared to be broken and only two things appeared knocked over. Although the defendant told the 911 operator that the victim made threats, the danger from the victim's alleged threats against the defendant's parents was not imminent, as her parents were not at the scene of the crime. Many witnesses testified that the victim was peaceful. The jury could have believed that the defendant's bruises had an alternative explanation or that the bruises, which were mainly on her thighs, did not support the inference that she reasonably feared death or serious bodily injury. Accordingly, we conclude that the evidence is legally sufficient to support the conviction.

The defendant urges us to conclude that the record demonstrates that she acted in a state of passion and that the highest offense she could be guilty of is voluntary manslaughter. Voluntary manslaughter is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a). It is distinguished from second degree murder by the presence of adequate provocation leading to a state of passion. *State v. Williams*, 38 S.W.3d 532, 538 (Tenn. 2001). The question of whether the provocation was adequate falls to the province of the jury. *State v. Johnson*, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995). "Premeditation is mutually exclusive with passion produced by adequate provocation." *State v. Winselle*, W2007-00139-CCA-R3-CD, 2008 WL 450465, at *7 (Tenn. Crim. App. Feb. 20, 2008); *see also Baxter v. State*, 503 S.W.2d 226, 229 (Tenn. Crim. App. 1973) ("[T]he law is well settled that if premeditation exists, it is immaterial that the defendant was in a passion when that design was executed."). In light of our conclusion above that the evidence is legally sufficient to sustain the first degree premeditated murder conviction, the defendant is not entitled to relief.

22

## II. Jury Instructions

### A. Standard of Review

The defendant challenges numerous alleged errors in the jury instructions. Questions regarding the propriety of jury instructions are mixed questions of law and fact, and we review them de novo with no presumption of correctness. *State v. Fayne*, 451 S.W.3d 362, 373 (Tenn. 2014) (citing *State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001)).

### B. Submission of a Question of Law to the Jury

The defendant asserts error in the trial court's inclusion of the prefatory words of the pattern jury instructions regarding whether the defense of self-defense had been fairly raised by the evidence. The trial court instructed the jury: "If evidence has been introduced supporting self-defense, the burden is on the state to prove beyond a reasonable doubt that [the defendant] did not act in self-defense."

The defendant, on the first day of the trial, filed a document making special requests for jury instructions. The filing included a request to remove the phrase "If evidence has been introduced supporting self-defense," as improperly submitting a question of law to the fact-finder. During the charge conference, however, the defendant did not request that the court take out the phrase. The parties had an extensive discussion of the self-defense instruction, and the defense requested several alterations. At the end of the discussion, the court asked if there were any other issues with the second page of the self-defense instruction, and the defense answered in the negative.

Tennessee Rule of Criminal Procedure 30(b) addresses objections to jury instructions. Under Rule 30(b), "[c]ounsel's failure to object does not prejudice the right of a party to assign the basis of the objection as error in a motion for a new trial." Tenn. R. Crim. P. 30(b). When the defendant challenges an erroneous or inaccurate jury charge, as opposed to an incomplete jury charge, Rule 30 allows the issue to be raised in the motion for a new trial even if no objection was made contemporaneously. *State v. James*, 315 S.W.3d 440, 446 n.2 (Tenn. 2010); *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005); *State v. Lynn*, 924 S.W.2d 892, 899 (Tenn. 1996).

The pattern jury instruction for self-defense, citing to Tennessee Code Annotated section 39-11-201(a)(3), includes the sentence, "If evidence is introduced supporting self-defense, the burden is on the state to prove beyond a reasonable doubt that the defendant did not act in self-defense." 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 40.06(b). The

jury instructions in the defendant's trial were taken verbatim from this pattern, with the exception that the defendant's name was substituted.

Under Tennessee Code Annotated section 39-11-203(c), "[t]he issue of the existence of a defense is not submitted to the jury unless it is fairly raised by the proof." The comments clarify that "[t]he defendant has the burden of introducing admissible evidence that a defense is applicable. If the defense is at issue, the state must prove beyond a reasonable doubt that the defense does not apply." T.C.A. § 39-11-203 Sentencing Comm'n Cmt.

The initial determination regarding whether evidence fairly raising self-defense has been introduced is one for the trial judge. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007) ("To determine if a defense has been fairly raised by the proof, *a court* must consider the evidence in the light most favorable to the defendant, including all reasonable inferences that may be drawn therefrom." (Emphasis added)); *see also State v. Hatcher*, 310 S.W.3d 788, 816-17 (Tenn. 2010); *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998); *State v. Blackmon*, 78 S.W.3d 322, 331 (Tenn. Crim. App. 2001) ("The threshold question of whether the defense of entrapment has been 'fairly raised' is for determination by the judge and not the jury."); *State v. Bult*, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998) (noting that *a court* considers the evidence in the light most favorable to the defendant in order to determine if the defense is fairly raised by the proof). We conclude that the trial court should not have included in the jury instructions the prefatory phrase, "If evidence is introduced supporting self-defense," because this was not a proper determination for the jury but for the court itself.

However, an error in instructing the jury is subject to harmless error review. *Cauthern v. State*, 145 S.W.3d 571, 600 (Tenn. Crim. App. 2004). When the error is constitutional in nature, then the burden is on the State to prove harmlessness beyond a reasonable doubt. *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008). Not every erroneous instruction "rises to the level of constitutional error." *Faulkner*, 154 S.W.3d at 60 (concluding that error in including nature-of-conduct language in instruction was not constitutional error). When error is not constitutional, a final judgment "shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). Here, the error in submitting the issue to the jury did not deprive the defendant of her constitutional right to a jury trial or any other constitutional right, and we apply non-constitutional harmless error analysis. *See Rodriguez*, 254 S.W.3d at 371.

The defendant's theory of the case throughout trial was that she acted in self-defense. Evidence pertinent to self-defense, including bruises sustained by the defendant,

24

her statement to the 911 operator, the victim's threatening text messages, items knocked over in the bedroom, a knife in the bed, and evidence that the victim possessed the murder weapon, were introduced at trial. The defendant's cross-examination of witnesses asked them to confirm that the defendant's injuries were consistent with her having been assaulted. Both the defense and the State referred numerous times during opening and closing argument to self-defense. The State acknowledged to the jury in closing that the 911 call was evidence of self-defense. The prosecutor argued that the knife was in the bed because "if you're going to claim self-defense, you've got to give them a weapon." The prosecutor's last words to the jury were, "Did she act in self-defense[?] I believe the State has carried its burden that she did not act in self-defense, and we would ask you to find [the defendant] guilty of the first-degree murder of [the victim]." The prosecution in effect conceded to the jury that evidence was introduced supporting self-defense and that the jurors had to determine whether the State had negated the defense beyond a reasonable doubt. Accordingly, there is simply no possibility of jury confusion regarding the fact that evidence of self-defense had been introduced and that the jury was required to consider the issue. The error in including the prefatory phrase was harmless by any standard, and the defendant is not entitled to relief.

### C. Combining "No Duty to Retreat" Instruction with Self-Defense Instruction

The defendant also objects to the trial court's instructions regarding self-defense and "no duty to retreat" on the basis that combining the concepts into one sentence was confusing to the jury. The trial court instructed the jury:

> If [the defendant] was not engaged in unlawful activity and was in a place where she had a right to be, she would also have no duty to retreat before threatening or using force intended or likely to cause death if [the defendant] had a reasonable belief that there was an imminent danger of death or serious bodily injury, the danger creating the belief of imminent death or serious bodily injury was real, or honestly believed to be real at the time, and the belief of danger was founded upon reasonable grounds.

This instruction was drawn verbatim from the pattern jury instructions. *See* 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 40.06(b). In its written request to the trial court, the defendant proposed altering the instruction as follows:

> In the defense of self, a defendant may use force intended or likely to cause death or serious bodily injury if the

25

defendant had a reasonable belief that there was an imminent danger of death or serious bodily injury, the danger creating the belief of imminent death or serious bodily injury was real, or honestly believed to be real at the time, and the belief of danger was founded upon reasonable grounds.

If a defendant was not engaged in unlawful activity and was in a place where she had a right to be, the defendant has no duty to retreat before using force intended or likely to cause death or serious bodily injury.

The defendant's alteration essentially consisted in separating the "no duty to retreat" concept and placing it in a sentence after the self-defense instruction. As the defendant notes, the pattern jury instructions are taken from the statute delineating self-defense:

2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
(C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611(b).

A defendant has a right to a correct and complete jury charge. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). This right is constitutional in nature. *State v. Phipps*, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). The trial court must present the propositions of law governing the case plainly to the jury, in such a manner as to enable them to comprehend the principles involved. *State v. Williamson*, 919 S.W.2d 69, 80 (Tenn. Crim. App. 1995). "Nothing short of this will 'satisfy the demands of justice' or the defendant's right to a jury trial." *Id.* (quoting *Crawford v. State*, 44 Tenn. 190, 195 (1867)).

26

The defendant cites to *State v. McAfee*, where this court examined jury instructions which tracked the statutory language regarding use of a prior conviction to establish that the defendant was a habitual offender. *State v. McAfee*, 737 S.W.2d 304, 308 (Tenn. Crim. App. 1987). The court in *McAfee* stated that the accused "'is entitled to a clear and distinct exposition of the law of his case as applicable to the facts,'" and it concluded that the statute was so confusing that the trial court should have included an explanation in its instructions. *Id.* (quoting *Strady v. State*, 45 Tenn. 300, 307 (1868)). "Simply reading a statute to the jury, when the statute is ambiguous and open to more than one interpretation, does not satisfy 'the demands of justice' or the accused's constitutional right of trial by jury." *State v. Raines*, 882 S.W.2d 376, 382 (Tenn. Crim. App. 1994).

Nevertheless, "[a]n instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005). When a trial court's instructions correctly, fully, and fairly set forth the applicable law, the trial court's refusal to give a requested special instruction does not amount to error. *Phipps*, 883 S.W.2d at 142.

The instructions here, while not perhaps a model of clarity, adequately set forth the applicable law and the issues of fact which the jury had to determine. Unlike the statutory language requiring reversal in *McAfee*, the statute forming the basis for the challenged instruction was not ambiguous in any way. *See McAfee*, 737 S.W.2d 304, 308 ("The language of the statute incorporated in the trial court's charge is confusing and lends itself to an interpretation that the principal or triggering offense can be used as one of the three prior convictions alluded to in the statute."). We conclude that the defendant is not entitled to relief.


### D. Self-Defense Instruction

The defendant challenges the trial court's refusal to include the requested instructions on self-defense in the section regarding the State's burden of proof. The defendant requested the following instructions:

> To convict [the defendant] of any criminal offense, the State must have proven beyond a reasonable doubt:
>
> (1) all of the elements of the crime charged or any lesser included offenses,
>
> (2) the negation of the defense of self-defense, and

27

(3) that the crime charged or any lesser included offenses of it was committed before the finding and returning of the indictment in this case.

The trial court instead charged the jury:

The State must have proven beyond a reasonable doubt all of the elements of the crime charged, and that it was committed before the finding and returning of the indictment in this case.

The defense points to Tennessee Code Annotated section 39-11-201, which clarifies what the State must prove in order to obtain a conviction. The statute mandates that:

(a) No person may be convicted of an offense unless each of the following is proven beyond a reasonable doubt:

(1) The conduct, circumstances surrounding the conduct, or a result of the conduct described in the definition of the offense;

(2) The culpable mental state required;

(3) The negation of any defense to an offense defined in this title if admissible evidence is introduced supporting the defense; and

(4) The offense was committed prior to the return of the formal charge.

T.C.A. § 39-11-201. While the trial court's instructions on burden of proof included the requirement that the elements of the crime and the timing of the offense must be proven beyond a reasonable doubt, the instructions did not track the statute in that they did not include the requirement that the State must negate any defense beyond a reasonable doubt. The trial court's instructions were taken verbatim from the pattern jury instructions. *See* 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 2.04.

The defendant does not dispute that the trial court charged the jury regarding the State's burden to negate self-defense elsewhere in the instructions. The trial court's instructions included the following language in the section regarding self-defense:

> If evidence is introduced supporting self-defense, the burden is on the state to prove beyond a reasonable doubt that [the defendant] did not act in self-defense.

> If from all the facts and circumstances you find [the defendant] acted in self-defense, or if you have a reasonable doubt as to whether [the defendant] acted in self-defense, you must find her not guilty.

On appeal,[3] the defense also requests that this court suggest pattern jury instructions which include, as an element of each offense charged and each lesser included offense, the requirement that the State negate self-defense. For instance, the defendant asserts that the elements of first degree murder should be as follows:

> First Degree Murder

> Any person who commits the offense of First Degree Murder is guilty of a crime.

> For you to find the defendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements:

> (1) That the defendant unlawfully killed the alleged victim;

> and

> (2) that the defendant acted intentionally....;

> and

> (3) that the killing was premeditated;

---

[3] The defendant did not request this instruction at trial either in her written filing or during the charge conference.

and

(4) that the killing was not done in self-defense.

The defendant suggests that this court should hold that non-affirmative defenses must be charged, not in isolation, but in conjunction with the other matters which the State must prove beyond a reasonable doubt to obtain a conviction, and he asserts that this error has denied the defendant her constitutional right to a jury trial.[4] The State acknowledges that the State bears the burden of negating a non-affirmative defense beyond a reasonable doubt but asserts that the jury instructions adequately conveyed the State's burden to the jury.

We reiterate that the trial court's duty is to provide a complete charge of the law as applicable to the facts of the case. *State v. James*, 315 S.W.3d 440, 446 (Tenn. 2010). The judge must properly instruct the jury "on the law governing issues raised by the evidence introduced at trial," and must submit on proper instructions "every issue of fact raised by the evidence and material to [the] defense." *Phipps*, 883 S.W.2d at 142, 149. Because jurors are "usually untrained in the law and unfamiliar with its myriad intricacies," they depend on instructions from the trial court in deliberating. *State v. Davis*, 266 S.W.3d 896, 907 (Tenn. 2008). Jury instructions can be "confusing, tedious, and perhaps initially overwhelming to a juror." *Id.* The court should consider that:

> [j]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

---

[4] The defense cites to the Model Penal Code and to Hawaii's statutory scheme, which incorporate the State's duty to disprove a defense into the elements of the offense. *See* Model Penal Code § 1.13 ("'element of an offense' means (i) such conduct or (ii) such attendant circumstances or (iii) such a result of conduct as . . . negatives an excuse or justification for such conduct"); Haw. Rev. Stat. § 702-205 ("The elements of an offense are such (1) conduct, (2) attendant circumstances, and (3) results of conduct, as: … (b) Negative a defense"). We note that the commentary to the Hawaii Criminal Jury Instructions declares that "[t]he Committee was unable to agree on whether negating a defense, when properly raised, should be set forth as an element in the elements instruction, or whether it is sufficient that a clear statement of the prosecution's burden to negate the defense beyond a reasonable doubt be contained in the instruction on the defense." Haw. Pattern Jury Instructions – Criminal 5.01 commentary.

30

*State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998) (quoting *Boyde v. California*, 494 U.S. 370, 380-81 (1990)).

"Although the Pattern Jury Instructions do not have the force of law, our trial courts 'frequently use them as a source for jury instructions.'" *Davis*, 266 S.W.3d at 901 n.2 (quoting *State v. Rutherford*, 876 S.W.2d 118, 120 (Tenn. Crim. App. 1993)). Pattern jury instructions, which are not officially approved by the appellate courts or legislature, "should be used only after careful analysis." *State v. Hodges,* 944 S.W.2d 346, 354 (Tenn. 1997). Pattern jury instructions are only suggestions and "are not entitled to any particular deference on review." S*tate v. Rimmer*, 250 S.W.3d 12, 30 (Tenn. 2008). "Trial courts are not limited to the mere recitation of the pattern instructions," *James*, 315 S.W.3d at 446, and the defendant is entitled to have the jury properly instructed to consider every issue of fact raised by the evidence, *Phipps*, 883 S.W.2d at 149-50.

"An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005). In reviewing jury instructions, we do not parse phrases to determine their validity in isolation; rather, we examine the instructions as a whole to determine "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *James*, 315 S.W.3d at 446 (quoting *Rimmer,* 250 S.W.3d at 31). Accordingly, an appellate court must determine if there is a reasonable likelihood that the jury applied the challenged instruction in such a way that the defendant's constitutional rights have been violated. *Rimmer,* 250 S.W.3d at 31. Due process guarantees that "every fact necessary" to constitute the crime must be proven beyond a reasonable doubt. *James*, 315 S.W.3d at 447 (quoting *In re Winship,* 397 U.S. 358, 364 (1970)).

The statutory language requires the State to prove beyond a reasonable doubt the elements of the offense, including mens rea, the timing of the return of the indictment, and the negation of any non-affirmative defense when it has been raised by the proof. T.C.A. § 39-11-201(a). While the requested instruction was not given in conjunction with the other statutory requirements, the jury instructions clearly informed the jury that the State bore the burden of negating self-defense beyond a reasonable doubt and that if the jurors had reasonable doubt that the defendant acted in self-defense, they were to acquit her. Jurors bring a common-sense understanding of self-defense to deliberations. This is not a case where subtleties in legal distinction "would be lost on most jurors absent clear instructions." *Phipps*, 883 S.W.2d at 150.

We conclude that the instructions here, read as a whole, adequately convey the State's burden of proof regarding self-defense, and we conclude that the defendant's

constitutional rights were not violated by the trial court's failure to include the State's duty to negate self-defense multiple times in the instructions. *See James*, 315 S.W.3d at 453-54 (concluding that there was not error in instructions which might have been improved by including the term "corroboration" but as a whole were "compliant with the traditional definition" of corroborating evidence and sufficiently emphasized the State's burden of proof with regard to each element); *Hodges*, 944 S.W.2d at 354 (instructions which erroneously instructed jurors to consider mitigating circumstances which had been "proven" rather than "raised" were nevertheless adequate because the proper standard was clarified elsewhere in the instructions); *Vann*, 976 S.W.2d at 101-02 (concluding that although the proof did not warrant a proximate cause instruction, the instructions did not shift the burden of proof to the defendant and that the jury instructions, as a whole, did not relieve the State of proving intent); *Faulkner*, 154 S.W.3d at 60-61 (concluding that, although both result-of-conduct and nature-of-conduct language were included in the definition of "intentionally," the entire charge "eliminated any risk of the jury applying the wrong definition" and there was no constitutional error); *Rimmer*, 250 S.W.3d at 30, 31 (concluding that instructions that reasonable doubt "does not mean a doubt that may arise from possibility" were not misleading in the context of instructions which also gave a correct definition of the term); *but see Phipps*, 883 S.W.2d at 151 (the jury charge did not provide a clear and distinct exposition of the law when the jury instructions suggested that consideration of evidence of post-traumatic stress disorder was not pertinent to *mens rea*).

The conclusion that the instructions here were adequate to protect the defendant's rights to a trial by jury and to due process does not preclude the conclusion that the State's burden to negate self-defense might be further clarified. *See State v. Jackson*, 173 S.W.3d 401, 407-08 (Tenn. 2005) (holding that instructing jury regarding a presumption in favor of second degree murder should be abandoned but concluding that this was a mere clarification of the law); *Miller v. State*, 54 S.W.3d 743, 747 (Tenn. 2001) (recognizing that the court's "abandonment of a potentially confusing jury instruction does not automatically mean that prior use of the abandoned jury instruction was constitutional error"); *Rimmer,* 250 S.W.3d at 31 (concluding that the challenged instruction was not helpful, and that its use, while not rising to the level of a constitutional violation, should be discouraged).

As the defendant notes, both this court and the Tennessee Supreme Court have taken occasion to suggest or clarify jury instructions. *See State v. Page*, 81 S.W.3d 781, 788 (Tenn. Crim. App. 2002) (clarifying correct jury instruction for knowing second degree murder, which the court determined to be a result-of-conduct offense); *see also State v. White*, 362 S.W.3d 559, 580-81 (Tenn. 2012) (concluding that jury instructions for "substantial interference" element of kidnapping were inadequate and providing interim instructions while inviting the Tennessee Pattern Jury Instruction Committee to

32

revise the pattern jury instructions); *State v. Dyle*, 899 S.W.2d 607, 612 (Tenn. 1995) (promulgating instructions regarding identity in light of fallibility of eyewitness testimony); *cf. State v. Farner*, 66 S.W.3d 188, 205 (Tenn. 2001) (concluding that absence of proximate cause instruction from pattern criminally negligent homicide causation required general causation instruction to be given to the jury). Because we conclude that the instructions here, in contrast to those above, were not erroneous, we decline to suggest revised jury instructions. We instead invite the Tennessee Pattern Jury Instruction Committee to visit the issue in order to determine whether a revision to the instructions is warranted to better convey to the jury the State's burden of proof regarding the negating of non-affirmative defenses beyond a reasonable doubt.

### E. Lesser-Included Offenses Within Instructions on Burden of Proof and Identity

The defendant next asserts that the trial court erred in failing to grant the defendant's request to give "equal dignity" to the lesser-included offenses by essentially including the phrase "or any lesser included offenses" in instances where the instructions refer to the "crime charged."

The defendant's special request asked the court to charge the jury regarding the burden of proof as follows:

> …. This presumption remains with [the defendant] throughout every stage of the trial, and it is not overcome unless from all the evidence in the case you are convinced beyond a reasonable doubt that [the defendant] is guilty *of the charged or any lesser included offenses*.
> ….
> To convict [the defendant] of any criminal offense, the State must have proven beyond a reasonable doubt:
> (1) all of the elements of the crime charged *or any lesser included offenses*,
> (2) …
> (3) that the crime charged *or any lesser included offenses* was committed before the finding and returning of the indictment in this case.

(Emphasis in original). Instead, the trial court charged the jury:

> This presumption remains with [the defendant] throughout every stage of the trial, and it is not overcome

33

unless from all the evidence in the case you are convinced beyond a reasonable doubt that [the defendant] is guilty.

….

The State must have proven beyond a reasonable doubt all of the elements of the crime charged, and that it was committed before the finding and returning of the indictment in this case.

The defendant also requested the court to alter the charge on identity to mention lesser-included offenses:

The Court further charges you that if you are satisfied from the whole proof in the case, beyond a reasonable doubt, that the defendant . . . committed the crime charged against her *or any lesser included offenses*, and you are satisfied beyond a reasonable doubt that she has been identified as the person who committed the crime charged *or any lesser included offenses*, then it would be your duty to convict her *of the crime charged or any lesser included offenses*. On the other hand, if you are not satisfied with the identity from the proof, or you have a reasonable doubt as to whether she has been identified from the whole body of the proof in the case, then you should return a verdict of not guilty.

The trial court's charge to the jury omitted the italicized portions of the text above.

The defendant asserts that the failure to include the requested language was error requiring reversal. The defendant's constitutional right to a complete and correct charge includes the right to jury instructions on all lesser-included offenses which are supported by the proof. *State v. Thorpe*, 463 S.W.3d 851, 859 (Tenn. 2015). "When lesser-included offenses are included in the charge, a judge must instruct the jury on how and in what order it should consider the offenses." *Bryant v. State*, 460 S.W.3d 513, 524 (Tenn. 2015). The Tennessee Supreme Court has concluded that policy considerations support the use of "acquittal-first" jury instructions, requiring the jury to acquit on a greater offense before it may consider a lesser. *State v. Davis*, 266 S.W.3d 896, 907 (Tenn. 2008). Neither the defendant nor the prosecution is permitted to preclude the jury from considering a lesser included offense as part of trial strategy. *State v. Brown*, 311 S.W.3d 422, 431 (Tenn. 2010).

34

Here, while the trial court refused to include the references to lesser-included offenses in the parts of the jury charge concerning identity and burden of proof, the remainder of the charge clearly informed the jury that it must consider the lesser-included offenses if it chose to acquit on the greater offense, that it must consider them in sequence, and that the State bore the burden of proving the lesser-included offenses beyond a reasonable doubt. For each lesser-included offense, the trial court's instructions directed the jury that "the State must have proven beyond a reasonable doubt the existence of the following essential elements" in order for the jury to find the defendant guilty of the offense. Furthermore, in the section instructing the jury on "Order of Consideration," the trial court reiterated that a guilty verdict required the jury to "find the defendant guilty beyond a reasonable doubt of the lesser-included offense" and that if the jury found "reasonable doubt as to the defendant's guilt of the lesser-included offense," then it should acquit on that offense and consider the next lesser-included offense. In jury deliberations, "common[]sense understanding of the instructions in the light of all that has taken place at the trial [is] likely to prevail over technical hairsplitting." *State v. Van Tran*, 864 S.W.2d 465, 479 (Tenn. 1993) (quoting *Boyde v. California*, 494 U.S. 370, 380–381 (1990)). We conclude that the instructions, read as a whole, were not deficient or likely to mislead the jury, and the defendant is not entitled to relief.

## F. Cumulative Error

Finally, the defendant asserts that he is entitled to relief due to cumulative errors in the jury instructions. The doctrine of cumulative error recognizes that "there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). Because cumulative error is only applicable where the accused has established there was more than one error committed, the defendant cannot premise relief on this theory. *Id.* at 77.

## III. Closing Argument

The defendant's final issue asserts that the prosecutors improperly used a door as a demonstrative aid in rebuttal argument. The defendant asserts that introduction of the door was in error because it was "speculative" and not based on facts in evidence and because it was outside the scope of the defense's closing argument. The defendant also argues that permitting the prosecution to use the door during rebuttal in particular was a violation of Tennessee Rule of Criminal Procedure 29.1(d)(2) in that the defendant was not able to fully answer the State's demonstration, and she asserts that this error resulted

in a violation of the defendant's right to a jury trial, right to counsel, and due process rights.

Closing argument is a valuable privilege that should not be unduly restricted. *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001). Lawyers are expected to be zealous advocates and should be given great latitude in both the style and substance of their arguments. *State v. Banks*, 271 S.W.3d 90, 130-31 (Tenn. 2008). The trial court has significant discretion to control closing argument. *Id.* at 132. Nevertheless, closing argument must be temperate, predicated on the evidence adduced at trial, and pertinent to the issues. *State v. Jordan*, 325 S.W.3d 1, 64 (Tenn. 2010). While the prosecutor "may strike hard blows, he is not at liberty to strike foul ones." *Id.* (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)).

It is clear that demonstrative evidence, including a reenactment of the crime, may be introduced during trial, and the decision to allow a courtroom demonstration as evidence rests within the discretion of the trial court. *State v. Coulter*, 67 S.W.3d 3, 55-56 (Tenn. Crim. App. 2001) (concluding that demonstration allowing jurors to pull the trigger of the weapon to demonstrate the amount of force required was proper) *abrogated on other grounds by State v. Merriman*, 410 S.W.3d 779, 793 (Tenn. 2013); *see State v. Reid*, 164 S.W.3d 286, 344 (Tenn. 2005) (appendix) (concluding that allowing the use of a styrofoam head to illustrate a bullet's trajectory was not error); *State v. Stanley B. Hill*, No. E2012-00289-CCA-R3CD, 2013 WL 4715115, at *10-11 (Tenn. Crim. App. Aug. 30, 2013), *perm. app. denied* (Tenn. May 15, 2015) (concluding that the trial court properly allowed the medical examiner to use a bed to demonstrate that the rope was too short for the victim to hang herself and that defendant's version of events could not have caused the victim's injuries); *State v. Douglas Marshall Mathis*, No. M2002-02291-CCA-R3CD, 2004 WL 392710, at *9-10 (Tenn. Crim. App. Mar. 3, 2004) (allowing State to introduce a sawed-off shotgun, which was not the murder weapon, to illustrate what the murder weapon would have looked like); *State v. Billy Gene DeBow, Sr.*, No. M1999-02678-CCA-R3CD, 2000 WL 1137465, at *11 (Tenn. Crim. App. Aug. 2, 2000) (holding that there was no error in permitting a demonstration of the manner in which shells were ejected from the weapon); *Ronald Bradford Waller v. State*, No. E1999-02034-CCA-R3-PC, 2000 WL 982103, at *16 (Tenn. Crim. App. July 18, 2000) (holding that requiring the defendant to demonstrate how physical confrontation took place during his testimony was not improper); *State v. Jeffrey W. Porter*, C.C.A. No. 88-60-III, 1989 WL 4939, at *7 (Tenn. Crim. App. Jan. 24, 1989) (concluding that asking the defendant to demonstrate on a doll how he had held and hit the child was not improper); *State v. Underwood*, 669 S.W.2d 700, 704 (Tenn. Crim. App. 1984) (holding that it was not error to allow two law enforcement officers to reenact the defendant's demonstration of how he had committed the crime).

The introduction of demonstrative evidence is permissible not only during trial but also during closing argument. *See State v. Michael Presson*, No. W2012-00023-CCA-R3CD, 2014 WL 1669860, at *23 (Tenn. Crim. App. Apr. 24, 2014), *perm. app. denied* (Tenn. Nov. 10, 2014) (concluding that allowing the State to demonstrate during rebuttal argument that a vibrator previously entered into evidence had functioning batteries to rebut the defendant's closing argument that it belonged to his long-dead wife was not improper); *Issac Scott v. State*, No. W2009-01256-CCA-R3-PC, 2011 WL 744764, at *6 (Tenn. Crim. App. Mar. 2, 2011) (concluding that counsel was not deficient in failing to object to the State pausing for ninety seconds during rebuttal argument to indicate amount of time victim was choked because there was no impropriety in doing so); *State v. Walker*, 729 S.W.2d 272, 275 (Tenn. Crim. App. 1986) (concluding that a demonstration that simulated the State's theory of the shooting using evidence introduced at trial was not improper and noting that the jury was instructed that the demonstration was merely the State's theory).

This court has also approved of the use of demonstrative evidence that was not admitted at trial during the State's rebuttal argument. In *State v. Porter*, the defense, in closing, referred to evidence supporting guilt as "garbage." *Porter*, 1989 WL 4939, at *8. In rebuttal, the prosecutor took a doll, not in evidence, and demonstrated the State's theory of how the victim had been injured by shaking the doll for twenty seconds. *Id.* This court concluded that the prosecutor's actions were "demonstrating evidence already well established in the trial record; i.e., that the child's eyes and brain injuries resulted from its having been violently shaken, its head having been rocked back and forth for an estimated period of twenty seconds." *Id.* Accordingly, the court found that the defendant had not been denied a fair trial. *Id.* at *9.

There are five general areas of prosecutorial misconduct in closing argument: 1) intentionally misstating evidence or misleading the jury regarding inferences it may draw; 2) expressing personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant; 3) using argument calculated to inflame the passions or prejudices of the jury; 4) using argument which would divert the jury from its duty to determine facts based on evidence by interjecting issues broader than the guilt or innocence of the accused or by making predictions regarding the consequences of the verdict; 5) intentionally referring to or arguing facts outside the record unless they are matters of common public knowledge. *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

Here, the demonstration was responding to the defendant's theory of the case, which was that the victim had been shot in self-defense. The argument was temperate and based on the facts in evidence, in that the lead prosecutor referred to witness testimony regarding the analysis of the crime scene while the other prosecutor acted out

the victim's role during the shooting.[5]  The defense acknowledges that "had this occurred during the State's initial argument[,] the argument may have been proper perhaps."  We conclude there were no violations of the standards listed in *Goltz*.  However, the defendant urges us to create a rule that the State may not conduct a demonstration with objects not in evidence during rebuttal argument pursuant to Tennessee Rule of Criminal Procedure 29.1(d)(2).

Tennessee Rule of Criminal Procedure 29.1(d)(2) specifies that "while the state, having the burden of proof, has the right to open and close the argument, this right shall not be exercised in such way as to deprive the defendant of the opportunity to fully answer all state argument. The court, on motion, shall enforce this purpose."

In *State v. Deandre D. Rucker*, this court concluded that prosecutorial misconduct had resulted in reversible error when the prosecutor quoted rap lyrics containing racial slurs in rebuttal during closing argument.  *State v. Deandre D. Rucker*, No. M2014-00742-CCA-R3-CD, 2015 WL 4126756, at *6 (Tenn. Crim. App. July 9, 2015).  In *Rucker*, the trial court did not give limiting instructions.  *Id.*  Significantly, this court concluded that, given the timing of the argument in rebuttal, "it was meant to bolster the State's case in such a way and at a time that the defendant could not respond."  *Id.*  Likewise in *State v. Jackson*, the Tennessee Supreme Court noted that "the impermissible comment [regarding the defendant's choice not to testify] came at a critically important juncture in the trial—the prosecution's final, rebuttal argument to the jury. The defense had no opportunity to respond to the argument."  *State v. Jackson*, 444 S.W.3d 554, 592 (Tenn. 2014).  The *Jackson* court granted the defendant a new trial.  *Id.*

Throughout the trial, the defendant's theory of the case was that the victim was assaulting her and that she shot him in self-defense, firing the final shot out of fear when he grabbed her leg as she walked through the hallway.  Accordingly, the defendant's closing argument was not a surprise to the prosecution.  The prosecution apparently had a door manufactured and hung on a moving frame to illustrate the manner in which the State believed the crime occurred, but it declined to use the door in its initial closing statement.  Instead, it waited until the defense had finished its closing and then chose to reenact the crime.  It appears that the State reserved this demonstration for the purpose of "sandbagging" the defense.  *See State v. Donald W. Branch*, No. W1999-00506-CCA-R3CD, 2002 WL 1558485, at *19 (Tenn. Crim. App. Jan. 4, 2002).  While we disapprove of the prosecutor's decision to reserve the demonstrative evidence for rebuttal with the apparent purpose of placing it before the jury at a time when the defendant could not

---

[5] Apparently, one of the prosecutors, in reenacting the crime, held the wrong hip to indicate a gunshot wound.  The defendant objected and asked the prosecutor to correct her gestures, and the defendant does not assert that this mistake requires reversal.

respond, we conclude that the use of the door did not ultimately amount to a deprivation of the opportunity to fully answer the State's argument under Rule 29.1(d)(2).

"A criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." *State v. Banks*, 271 S.W.3d 90, 131 (Tenn. 2008). Generally, impropriety in closing statements is evaluated to determine whether the conduct affected the verdict to the defendant's prejudice. *Bane*, 57 S.W.3d at 425. The court considers: 1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; 2) the curative measures undertaken by the court and the prosecution; 3) the intent of the prosecutor in making the improper statement; 4) the cumulative effect of the improper conduct and any other errors in the record; and 5) the relative strength or weakness of the case. *State v. Larkin*, 443 S.W.3d 751, 813 (Tenn. Crim. App. 2013). However, the Tennessee Supreme Court has noted that in cases of constitutional error in closing arguments, the burden is on the State to prove harmlessness beyond a reasonable doubt. *Jackson*, 444 S.W.3d at 591 (applying this standard to the prosecutor's comment on the defendant's assertion of her Fifth Amendment right against self-incrimination). In evaluating whether the State has shown harmlessness beyond a reasonable doubt, "courts should consider the nature and extensiveness of the prosecutor's argument, the curative instructions given, if any, and the strength of the evidence of guilt." *Id.*

Citing to *Wallis v. State*, 546 S.W.2d 244 (Tenn. Crim. App. 1976), the defendant argues that the trial court's decision to allow the use of the door and reenactment in rebuttal essentially denied her the right to counsel because she was not able to respond to the reenactment. In *Wallis v. State*, the State presented an initial closing argument which spoke to the jury's general duties and did not reference the facts of the case. *Wallis v. State*, 546 S.W.2d 244, 246 (Tenn. Crim. App. 1976). The defense, relying on this mild closing, waived its closing argument. *Id.* The State was then permitted rebuttal, during which it attacked in detail the defendant and his theory of the case. *Id.* The defendant's request to rebut the State's argument was denied. *Id.* This court held that under these circumstances, the defendant should have been permitted sur-rebuttal. *Id.* at 248. In reversing, the court concluded that "the appellant's right to be heard by counsel ha[d] been abridged." *Id.*

This case differs from *Wallis*, in which the defendant made no closing argument at all, because here, defense counsel made a lengthy, thorough, and effective closing statement outlining the defendant's theory of how the shooting occurred. While the defendant asserts that she could not respond to the State's demonstration, she points to nothing in particular about the reenactment, other than its demonstrative nature, that would require response or which was not already addressed by the defendant's closing. Accordingly, the prosecution's use of the door did not abridge the defendant's right to

counsel. *Compare Herring v. New York*, 422 U.S. 853, 859 (1975) (noting that it is "universally" held that the defense has the right to make a closing statement to the jury and that "a total denial of the opportunity for final argument" is "a denial of the basic right of the accused to make his defense" even in the context of a bench trial). We further note that the defense, while objecting to the use of the door, never requested the trial court for sur-rebuttal. *See Wallis*, 546 S.W.2d at 248 (noting that in exceptional circumstances, the defendant may have the right to rebut the State's closing argument).

Neither did the prosecution's decision to reserve the door for rebuttal "deprive the defendant of the opportunity to fully answer all state argument." Tenn. R. Crim. P. 29.1(d)(2). While there was no surprise for the prosecution in the defendant's closing argument, neither was there any surprise for the defense in the statements which constituted the State's rebuttal argument. The State once again outlined its theory that the defendant had shot the victim, who was not the aggressor but was retreating before her. The defendant does not point to anything specific within the State's demonstration which merited a response that defense counsel had no opportunity to make.

Here, the only arguable impropriety was the reservation of the demonstration for a time when the defense had no opportunity to respond to the demonstration in particular. The demonstration itself was based on facts in evidence and was not improper. Neither did it exceed the scope of the defendant's own argument outlining how the shooting had occurred. The trial court twice gave the jury extensive instructions that the prosecution's reenactment was not evidence but merely an illustration of the State's theory and that the jury should disregard the argument if it found the argument not supported by the evidence. *Compare Jackson*, 444 S.W.3d at 592 (noting that curative instructions regarding prosecution's comment on the defendant's right not to testify "likely served to emphasize" the error). The jury is presumed to follow instructions. *Jordan*, 325 S.W.3d at 66. We conclude that the defendant is not entitled to relief.

## CONCLUSION

Based on the foregoing reasoning, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE

40